IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**HILFIKER SQUARE, LLC,** an Oregon
limited liability company,

                Plaintiff,

    v.

**THRIFTY PAYLESS, INC.,** a California
corporation,

                Defendant.

No. No. 6:16-cv-01885-MC

**OPINION AND ORDER**

**MCSHANE, Judge**:

    Plaintiff, Hilfiker Square, LLC, brings this breach of contract action against Defendant, Thrifty Payless, Inc. Plaintiff owns a parcel of land in the common area of a shopping center in Salem, Oregon. Defendant operates a Rite Aid store in the same shopping center. In 1984, the parties, or their predecessors in interest, entered into an agreement that forbids placement of buildings and structures in the common area of the shopping center. Defendant now refuses to modify this agreement to allow Plaintiff's construction of a new restaurant. This refusal to negotiate a modification, Plaintiff alleges, is a breach of Defendant's duty to deal in good faith. Because neither the contract nor any extrinsic evidence suggests that the original parties expected that their agreement would necessarily be modified to allow for common area development, no reasonable jury could find that Defendant was required to expressly justify its refusal to approve such development. Even assuming that this expectation existed, Defendant offered Plaintiff three business reasons for its position, none of which a reasonable jury could find lacked a rational basis. The defense motion for summary judgment is therefore GRANTED.

Page 1 – OPINION AND ORDER

## BACKGROUND

Plaintiff, Hilfiker Square, LLC ("Hilfiker"), is a limited liability company that owns a small parcel of land located in the northwest corner of Hilfiker Shopping Center ("Shopping Center") in Salem, Oregon. (Compl. ¶¶ 1, 3.) Defendant, Thrifty Payless, Inc. ("Rite Aid"), is a California corporation that's own and operates a neighboring retail store located within the same shopping center. (Compl. ¶ 2.) The remainder of Hilfiker Shopping Center is owned by nonparty Hilfiker Station, LLC, and consists of several retail stores. (Compl. ¶ 3.)

Hilfiker Shopping Center, and every parcel located therein, is subject to a recorded Declaration of Restrictions and Grant of Easements ("Declaration") created in 1984 by Pay Less Drug Stores Northwest, Inc., a predecessor of Defendant, and nonparty Albertson's, Inc. (Rubin Decl., Ex. 6.) The Declaration, amongst other things, restricts where buildings may be constructed. (Rubin Decl. Ex. 6 §§ 1.1(a)-(b), 2.1, 2.2.) Specifically, buildings may not be erected within the "Common Area," which is to be used exclusively for "vehicular driving, parking (except that there shall be no double deck parking), pedestrian traffic, directional signals, sidewalks, walkways, and landscaping." (Rubin Decl., Ex. 6 §§ 1.1(a)-(b), 2.1, 2.2.) These restrictions, the Declaration further instructs, "shall run with the land" and "inure to the benefit of and be binding upon the owners and their successors and assigns . . . ." (Rubin Decl., Ex. 6 §§ 6.1-6.2.)

In 2010, when Plaintiff acquired its present interest in the Common Area of the Shopping Center, it began lobbying the other occupants for a repeal of the prohibition on Common Area development. (Tokarski Decl., ¶¶ 3-5.) The Declaration includes a general "Modification Provision," which provides that modifications are permitted under the following circumstances:

> This Declaration may not be modified in any respect whatsoever or rescinded, in whole or in part, except with the consent of the Prime Lessees and the owners of

> the Parcels containing ninety percent (90%) of the total square footage of existing buildings in the Shopping Center at the time of such modification or rescission, and then only by written instrument duly executed and acknowledged by all of the required owners and Prime Lessees, [and] duly recorded in the office of the Recorder of Marion County, Oregon.

(Rubin Decl., Ex. 6 § 6.5.) Although Plaintiff obtained the consent of every other party subject to the Declaration, as well as building permits from the City of Salem, Defendant has refused to approve any modification of the Common Area restrictions. (Tokarski Decl. ¶ 8.)

Plaintiff formally and informally requested Defendant's permission to modify the Declaration on at least six occasions. (Berne Decl., Ex. 3 at 17; Roodhouse Decl., Ex. 1 at 1; Tokarski Decl., Ex. 2 at 1-4, Ex. 3 at 1-2; Rubin Decl., Ex. 7 at 2, Ex. 20 at 2-3.) In conjunction with these requests, Plaintiff offered Defendant various incentives and options, including purchasing Defendant's land, remodeling Defendant's store, entering a long-term lease-back with Defendant, and cash payments. (Tokarski Decl. ¶ 5.) On each occasion, Defendant has rejected these offers and declined to approve Plaintiff's proposed modifications. (Tokarski Decl. ¶ 8.)

Defendant twice provided Plaintiff with specific reasons for rejecting its proposals, expressing concerns about parking utilization and driveway operations, storefront visibility, future development, and the timing of its own potential store remodel.[1] (Rubin Decl., Ex. 13 at 2, Ex. 16 at 44-45.) On other occasions, employees in Defendant's Real Estate Group expressed the view that Rite Aid could arbitrarily reject any proposed modification of the Common Area restrictions. (*See, e.g.*, Berne Decl., Ex. 1 at 58:4-15, Ex. 2 at 36:8-18.) According to a representative of Plaintiff, Defendant's regional Real Estate Director also once stated that "hell

---

[1] There is also evidence in the record to suggest that the parties engaged in additional communications about Defendant's position and possible solutions to their impasse (*See, e.g.*, Berne Decl., Ex. 3 at 17 ("Let [sic] discuss further and I provide you with detail adn [sic] history [of why the proposal was rejected].").)

Page 3 – OPINION AND ORDER

would freeze over" before Rite Aid would allow development of the Common Area. (Roodhouse Decl. ¶ 6.)

To address Defendant's stated concerns about parking, circulation, and visibility, Plaintiff commissioned two studies to analyze the proposed projects' impacts. (Rubin Decl., Ex 16 at 46-62.) The studies concluded that parking, circulation, and visibility would not be materially impacted by the addition of a drive-through restaurant on Plaintiff's parcel. (Rubin Decl., Ex. 16 at 53-54). Defendant later commissioned its own study, which concluded that parking, circulation, and visibility would all be adversely impacted by Plaintiff's proposed development of the Common Area. (Christensen Decl., Ex. A at 1-11.) Plaintiff recently submitted a new development proposal to Defendant, based on a Letter of Intent for a Del Taco franchise, which remains pending at the time of this Opinion and Order. (Roodhouse Decl., Ex. 4.)

On August 18, 2016, following Defendant's most recent formal rejection, Plaintiff initiated this action for breach of contract in Marion County Circuit Court, alleging that Defendant violated the Declaration's implied covenant of good faith and fair dealing. Defendant removed the case to federal court and moved to dismiss Plaintiff's claim pursuant to Fed. R. Civ. P. 12(b)(6). The Court denied Defendant's motion and the parties completed discovery. The matter is once again before this Court on Defendant's Motion for Summary Judgment.

## STANDARDS

This Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could affect the outcome of the case and an issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citation omitted). When ruling on a

motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If the movant carries its burden, however, then the non-movant must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (quoting Fed. R. Civ. P. 56(e)). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient" to avoid summary judgment. *Liberty Lobby, Inc.*, 477 U.S. at 255.

## DISCUSSION

Defendant argues that it is entitled to summary judgment for four reasons. First, it argues that Plaintiff is no longer a party to the disputed contract and therefore lacks standing to enforce its express terms or any duties implied therein. (Def.'s Reply Br. 3-5.) Second, Defendant argues that, because Plaintiff failed to provide it with proposed building designs, it was under no obligation to consider an amendment to the contract. (Def.'s Br. 16-17.) Third, Defendant argues that, as a matter of law, the contract contains no implied covenant of good faith and fair dealing. (Def.'s Br. 17-22.) Here, it asserts that the express terms of the contract restrict Plaintiff from building in the Common Area and impose no limitations on Defendant's discretion to deny the modification or refuse to lift this restriction. (Def.'s Br. 17-22.) Finally, Defendant argues that, even if the contract does contain an implied duty of good faith, no reasonable jury could find that it withheld consent in bad faith. (Def.'s Br. 17-22.)

As an initial matter, Defendant's first two arguments are easily dismissed. Defendant's assertion that Plaintiff is no longer a party to the contract flies in the face of its earlier averment that Plaintiff is burdened by the covenants contained therein. (Def.'s Br. 13-16 ("[T]he restrictions in the Declaration agreed to by the original parties bind later owners.").) The

contract clearly states that all covenants run with the land and that its terms "shall inure to the benefit of and be binding upon the owners and their successors . . . ." (Rubin Decl., Ex. 6 § 6.2.) It is irrelevant, as Defendant suggests, that Plaintiff owns only a small part of the original larger parcel, as the entire Shopping Center is burdened and benefited by the covenants agreed to by the original contracting parties. (Rubin Decl., Ex. 6 § 1.1.) Indeed, despite explaining that certain types of third-party beneficiaries generally lack standing to enforce contracts, Defendant does not explain why Plaintiff would be considered a third-party beneficiary, somehow burdened by the building restrictions contained in the Declaration, but otherwise a non-party to its terms and unable to seek their amendment. (*See* Def.'s Br. 16.)

Defendant's second argument, that Plaintiff failed to satisfy a condition precedent, is also without merit. Although Section 2.4 of the Declaration states that "no building may be constructed . . . without the prior written approval" of all parties as to the proposed building's "exterior design, color, and elevations," that provision applies only to building projects otherwise authorized under the contract. (Rubin Decl., Ex. 6 § 2.4.) Defendant concedes as much when it states that the provision is only relevant to the construction of buildings in "portions of the Shopping Center where buildings are permitted." (Def.'s Br. 17.) This dispute does not concern Defendant's approval of a building project in a portion of the Shopping Center where buildings are permitted, but rather approval of a contractual modification to expand the authorized building area. (Compl. ¶ 7.) Since the terms governing modification of the contract contain no such design submission requirement, Plaintiff's failure to submit proposed building designs would not relieve Defendant of its obligation to comply with any other duties, express or implied, regarding modification of the contract. (*See* Rubin Decl., Ex. 6 § 6.5.)

Defendant is nevertheless entitled to summary judgment because Plaintiff has offered no evidence from which a reasonable jury could infer that the original parties expected Defendant to readily approve the addition of buildings in the Common Area. Under Oregon law, every contract contains an implied duty of good faith and fair dealing. *Hampton Tree Farms, Inc. v. Jewett*, 320 Or. 599, 615 (1995) (citations omitted). The purpose of this duty is to "ensure that parties will refrain from any act that would have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Klamath Off-Project Water Uses, Inc. v. Pacificorp*, 237 Or. App. 434, 445 (2010) (citations and internal quotation marks omitted). The good faith doctrine is therefore designed to "effectuate the [objectively] reasonable contractual expectations of the parties." *Best v. U.S. Nat'l Bank of Or.*, 303 Or. 557, 563 (1987). It does not, however, "vary the substantive terms of the bargain . . . [or] provide a remedy for an unpleasantly motivated act that is expressly permitted by contract." *U.S. Nat'l Bank of Or. v. Boge*, 311 Or. 550, 567 (1991). As a result, a duty of good faith and fair dealing "may be implied as to a disputed issue only if the parties have not agreed to an express term that governs that issue." *Or. Univ. Sys. v. Or. Pub. Emps. Union, Local 503*, 185 Or. App. 506, 511 (2002).

In the context of agreements granting unilateral discretion to one party, a duty of good faith is always implied absent language expressly allowing consent to be withheld "unreasonably." *Wells Fargo Bank, N.A. v. The Ash Org.*, No. 09–CV–188–MO, 2010 WL 2681675, at *7-8 (D. Or. July 2, 2010); *see also Tolbert v. First Nat'l Bank of Or.*, 312 Or. 485, 492 (1991) (clarifying this distinction).[2] Without such language, which itself makes clear the

---

[2] Although not bound by Judge Mosman's opinion, the Court notes that its holding is not inconsistent with the rule articulated in *Wells Fargo Bank*. Specifically, the Court agrees with Judge Mosman that, absent an express term, a contract granting one party unilateral discretion does not "include a right to act . . . in bad faith." *Id*. at *22-23. As noted below, however, the duty of good faith is case specific and tied to the reasonable expectations of the original contracting parties. As such, the dispositive issue here is not whether the contract contains an implied duty of good faith, but rather whether the original parties reasonably expected proposed modifications of the building restrictions to be approved absent a specific and legitimate business reason for not doing so.

Page 7 – OPINION AND ORDER

objectively reasonable expectations of the parties, a party acts in bad faith by exercising its discretion "for purposes not contemplated by the [original] parties." *Best*, 303 Or. at 563. To determine the purposes contemplated by the original parties, a trier of fact may consider both the terms of the contract and evidence extrinsic to its terms.[3] *Gregory Funding, LLC v. Saksoft, Inc.*, No. 3:16–cv–480–SI, 2016 WL 4480693, at *3 (D. Or. Aug. 24, 2016) (surveying Oregon law and concluding that "the reasonable expectations of the parties may include [extrinsic] evidence"). In turn, while an implied duty of good faith will often exist by operation of law, its precise contours are always case specific and dependent upon specific evidence. *See Arnett v. Bank of America, N.A.*, 874 F. Supp. 2d 1021, 1033-35 (D. Or. 2012) (drawing this distinction).

Here, the contract imposes a duty of good faith and fair dealing. As the Court held in its first Opinion and Order, the contract never expressly states that consent to proposed modifications may be withheld unreasonably. (Opinion and Order 6.) Defendant's attempt to relitigate this issue is unpersuasive. (Def.'s Reply Br. 8.) Indeed, Defendant writes at length about how clear the contract is in its prohibition on Common Area construction. (Def.'s Reply Br. 8.) That is true, but entirely inapposite to the matter before this Court. To conclude, as Defendant urges, that there is no implied duty to act in good faith, the provision governing *modification* of the contract, not building restrictions, would need to contain an unambiguous statement that consent could be withheld unreasonably. As already noted, it does not. (*See* Rubin Decl., Ex. 6.) A duty of good faith and fair dealing is therefore implied in the contract.

---

[3] As used in this sentence, the phrase "terms of the contract" refers not to an express term specifying how discretion may be exercised, but rather any surrounding terms which allow one to infer the reasonable expectations of the parties. Indeed, as just discussed, if an express term existed, there would be no question with respect to the parties' reasonable expectations. Therefore, although a contract may contain no express term stating that discretion can be exercised in an unreasonable manner, its other terms may nevertheless reflect that unfettered discretion is what the parties reasonably expected. *Cf. Pacific First Bank v. New Morgan Park Co.*, 319 Or. 342, 354 (1994) (concluding the same). This is an important distinction which neither party fully acknowledges in its briefs.

Nevertheless, Plaintiff fails to put forth evidence from which a reasonable jury could conclude that the original parties expected modifications of the building restrictions to be both freely granted and withheld only for specific reasons. The record contains two pieces of evidence relevant to this point: the contract itself and the testimony of two Rite Aid attorneys responsible for negotiating the original transaction with Albertsons. (Roodhouse Decl., Ex. 6; Hummelt Decl. ¶ 7; Rubin Decl., Ex. 24.) The attorneys' testimony clearly states that Rite Aid and Albertsons believed that consent to modification could be withheld arbitrarily and is thus of no assistance to Plaintiff. (Hummelt Decl. ¶ 7; Rubin Decl., Ex. 24 at 34:15-35:25.) Plaintiff, in turn, relies exclusively on Sections 2.4 and 5.4 of the contract, which provide that consent to new buildings and drive-through facilities shall not be withheld "unreasonably." (Rubin Decl., Ex. 6 § 2.4, 5.4.) As already discussed, however, both sections apply only to the approval of building projects in areas of the Shopping Center where construction is otherwise allowed. If anything, the inclusion of this language in Sections 2.4 and 5.4, but its omission from Section 6.5, supports the inference that the parties bargained for and expected unfettered discretion with respect to modifications. *See Pacific First Bank*, 319 Or. at 353-54 (drawing the same inference).

At base, Plaintiff is asking this Court to modify the contract, or rather force Defendant to renegotiate it, without any textual or extrinsic evidence that Defendant has undermined the original parties' reasonable expectations. This request falls outside the scope of any implied covenant of good faith and fair dealing, which only seeks to effectuate the objectively reasonable expectations of the parties. Indeed, outside of those reasonable expectations, a party is free to defend its own private business interests, even to the detriment of another party. A seller who describes a car as running well is expected to deliver a car with tires; but the buyer cannot expect a fresh coat of paint. A contractor who performs a kitchen remodel and sells the homeowner a

Page 9 – OPINION AND ORDER

refrigerator at the same time is expected to build an opening sufficient to fit the dimensions of the refrigerator; but if the homeowner decides to buy a larger refrigerator after the fact, the contractor is free to decline to perform the modification or insist upon an inflated price. As in these examples, the expectations of the parties must be clear, either through the original contract, common sense, or other extrinsic evidence, and cannot be held privately in the wishes of one party or their successor in interest. Here, Plaintiff has failed to carry this burden, offering no evidence from which a reasonable jury could infer that the original parties expected Defendant to readily approve the construction of new buildings in the Common Area.

This holding is not inconsistent with the Court's first Opinion and Order. In declining to dismiss Plaintiff's suit pursuant to Fed. R. Civ. P. 12(b)(6), the Court wrote that, "at a minimum, it was objectively reasonable for Hilfiker to expect Thrifty to negotiate, reasonably and in good faith, concerning any proposed amendment that is potentially beneficial to Hilfiker Shopping Center generally, and not materially adverse to Thrifty's specific financial and/or business interests." (Opinion and Order 7.) When making that statement, the Court accepted as true the allegations contained in Plaintiff's Complaint, had no other evidence before it, and was only required to conclude that Plaintiff had stated a plausible claim for relief. Plaintiff, however, has failed to support its allegations with respect to the parties' reasonable expectations and Defendant has offered contrary evidence. (*See* Hummelt Decl. ¶ 7; Rubin Decl., Ex. 24 at 34:15-35:25.) The general "purpose" statement contained in Section 1.3, standing alone, is now insufficient to support Plaintiff's contentions. *See Liberty Lobby, Inc.*, 477 U.S. at 255 (holding that the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient" to avoid summary judgment). Plaintiff points to no other evidence in the record,

other than its own averments, which could support a finding that the original parties expected amendments to be freely granted. Defendant is therefore entitled to summary judgment.

Still, even assuming Plaintiff could show that the parties reasonably expected approval to be withheld only for specific and legitimate business reasons, it remains unclear whether Plaintiff could survive summary judgment. Defendant provided at least three facially valid reasons for refusing to approve the proposed amendment: (1) its concerns about the project's impact on the visibility of its own store, (2) its concerns about the project's general impact on vehicular traffic in the Shopping Center, (3) its concerns about the project's impact on other land owners' abilities to pursue future development in the Shopping Center. (Rubin Decl., Ex. 13 at 2, Ex. 16 at 1-2.) Plaintiff asserts that these reasons were nevertheless offered in bad faith because they lack any rational basis in fact or, in the alternative, are merely pretext for some undefined harmful motive. (Pl.'s Br. 7-17.) The Court doubts, however, whether the record contains sufficient evidence from which a reasonable jury could draw either inference.

To support Plaintiff's first contention, the record would need to reflect, or at least allow a reasonable jury to infer, that no set of facts exists to support Defendant's concerns. Indeed, the question here is not whether a reasonable jury could infer that an alternative business judgment would have been reasonable or even possible, but whether one could infer that Defendant lacked any rational basis for its facially valid reasons. Plaintiff points to deposition testimony by Rite Aid employees stating that, when Rite Aid mailed its formal rejection letter on April 4, 2016, it had yet to commission an analysis demonstrating the empirical validity of its concerns. (Pl's Br. 13-14.) That Rite Aid had not invested the significant resources required to conduct its own study does not permit the inference that its stated reasons lack a rational basis. To the contrary, once it became clear that Plaintiff doubted the validity of its reasons, Rite Aid commissioned a

study explaining the grounds for its rejections. (Christensen Decl., Ex. A.) The only inference permitted by Plaintiff's competing study, as well as its repeated appeals to "common sense," is that an alternative business judgment was possible. The evidence contains nothing to support the inference that Defendant lacked a rational basis for its beliefs, particularly its concerns about future developments, and it is not this Court's place to second-guess a party's business decision simply because Plaintiff disagreed with it.[4]

Moreover, to the extent Plaintiff implies that Defendant was obligated to state reasons for its decision in each email or letter of rejection, it cites no case law or compelling logic to support that contention. (Pl.'s Br. 9-10.) Even assuming that Defendant was bound to approve Common Area modifications absent some legitimate business reason, it does not follow that Defendant was required to list those reasons in every communication or else face a presumption that it had no reasons or lacked a rational basis for any potential reasons. To suggest as much is to drift even further from the express terms of the contract or any general expectations implied therein. More importantly, however, there is no evidence in the record, or even suggestion in Plaintiff's own brief, that Hilfiker Square ever asked Defendant to provide its reasons prior to or right after its initial letter of rejection on August 10, 2010. (Tokarski Decl., Ex. 1.) Without more, it would be unreasonable for a jury to infer that Plaintiff lacked a rational basis for rejecting Defendant's proposal merely because it did not always divulge, without prompting, its reasons for withholding approval of the proposed modifications.

Finally, to support Plaintiff's allegation of pretext, the record would need to contain evidence suggesting that Defendant lied or otherwise harbored an improper motive. This is a

---

[4] Taken to its logical conclusion, Plaintiff's argument is that a contract granting all parties the discretion to veto a modification, and without an express term governing the procedure required to exercise that discretion, actually imposes an affirmative duty on the party exercising its discretion to not only commission a study demonstrating the unassailability of its reasons for rejecting a proposed modification, but to do so before rejecting the proposal and each and every time another party desires to submit such a proposal.

Page 12 – OPINION AND ORDER

closer question than those examined above and the Court would be uncomfortable granting summary judgment if pretext were the dispositive issue in this case. Plaintiff cites the repeated statements of key Rite Aid employees reflecting the belief that it could arbitrarily withhold consent and an alleged statement by Gregg Weiman, its regional Real Estate Director, that "hell would freeze over" before Rite Aid would offer its approval. (*See, e.g.*, Berne Decl., Ex. 1 at 12:22-13:14, 15:1-24, 58:7-12; Roodhouse Decl. ¶ 6.) There is, no doubt, a wide gulf between Defendant's belief that it had unfettered discretion and the conclusion that the justifications it did offer were outright lies. Plaintiff cites no evidence and offers no theory of what motive Rite Aid would have, outside of legitimate business reason, to decline Plaintiff's proposed modifications. Without any evidence of a nefarious motive, it is difficult to believe that a rational business actor would repeatedly rebuff such proposals unless doing so was in its perceived best interests. Nevertheless, because it constitutes a promised course of action and not just an abstract belief, Mr. Weiman's alleged statement at least permits the inference that Rite Aid fabricated reasons and arbitrarily withheld consent. Based on the other evidence before it, however, the Court must grant the defense motion for summary judgment.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

DATED this 10th day of January, 2018

/s/ Michael McShane
Michael J. McShane
United States District Judge